IDA MELISSE BENNETT et al., complainants,

*v.*

NEWARK MILK AND CREAM Co. et al., defendants.

[Decided July 27th, 1931.]

*Mr. Charles S. Smith,* for the complainants.

*Messrs. McCarter & English (Mr. Egner)* and *Messrs. Hood, Lafferty & Campbell (Mr. Hood),* for the defendants.

BACKES, V. C.

The bill is to set aside a sale by the complainants to Mr. William Scheerer of their one-half holdings in the Newark Milk and Cream Company on the ground of fraud. At the time of the sale Scheerer was the owner of the other half interest in the company. The sale took place in December, 1921. The repudiation came eight years later, with the filing of the bill in June, 1930.

The corporation was formed in 1894 by Mr. William H. Bennett to retail milk and its by-products in Newark and vicinity. Its capitalization was $25,000. Scheerer became his associate in the corporation more than thirty years ago, each owning one hundred and twenty-five shares of the stock. Bennett was the practical man; Scheerer is a banker. Ben-

nett managed; Scheerer co-operated. The business was successful and at Bennett's death in 1913, his shares were appraised at $37,500 ($300 per share). He devised and bequeathed the residue of his estate to the Fidelity (Union) Trust Company, executor, in trust, *inter alia,* to pay the income of his personal estate to his widow and two sons, the complainants, in equal shares, and at the death of the widow, the principal to the sons equally, except the shares in the company which he directed to be held until the younger son arrives at fifty, with power to sell if it should be decided to be prejudicial to the best interest of the estate to retain them, meantime, in conjunction with the stockholder, to manage the business of the company to make it "as profitable as possible to my estate." Mr. Stanley A. Rutz, in the employ of the company for thirty years, managed the company during the last illness of Bennett—two years—and has ever since been its manager and made a remarkable success of it, increasing the annual output from $700,000 in 1913 to $3,000,000 in 1920. Scheerer's brother, George, was associated with him. Scheerer had no part in the business. No doubt he advised in the management and dictated the policy of the company; but his knowledge of the condition of the business came from an annual audit of the books made by a firm of accountants engaged since before Bennett died. There had been discord between the Bennett and Scheerer interests ever since the death of Bennett. Rutz had discharged Mr. Chester L. Bennett, the older son, for alleged inattention, shortly after his father's death and the Bennetts were thereafter refused participation in the management and they were aggrieved and were militant; they felt that, as they were not in touch with the management of the company, they were kept in ignoranc of its affairs and that their dividends were purposely low to embarrass them. In 1919 they filed a bill for the construction of the Bennett will, the removal of the trustee, an inspection of the books of the company, the declaration of dividends, the removal of the directors and the appointment of a receiver. The matter was bitterly fought, on intermediate motions, until December,

1920, when the cause was referred to a vice-chancellor for hearing. The Bennetts were granted an inspection of the books. In May, 1921, they filed another bill attacking the management, asking for an accounting and a restraint upon Scheerer and his associates acting as directors and to oust them, and for a receiver. About the same time they petitioned the Essex orphans court to remove the Fidelity Union Trust Company as executor and trustee and for an accounting, and the cause was on trial when a settlement was reached. Prior, in 1915, there was litigation over the executor's account and for two years, 1916 to 1918, there was litigation over a share of stock in the company held by Rutz and which he surrendered only after a decree to that end was affirmed by the court of errors and appeals. It was during the trial in the orphans court, for the removal of the executor, that the judge suggested a settlement and the lawyers were agreeable. That meant purchase by Scheerer; the Bennetts had no means. Mr. Egner, for Scheerer, expressed his client's willingness to purchase, but declined to make an offer, insisting that it must come from the Bennetts. It was left to them and their lawyers, Mr. William Harris and Mr. Jacob Siff, to fix the price. With the field wide open, it is a fair assumption that the Bennetts did not stop short of the utmost they thought the traffic would stand. The two lawyers had vigorously prosecuted the litigations for upwards of two years and were conversant with every angle. Their accountant had inspected the books and they knew the condition of the company. Harris says the Bennetts first suggested $150,000, which he frowned upon, saying he could do better. This they deny, but nevertheless they set the price, dictated the terms, and delivered their proposition with an ultimatum that it must be accepted within twenty-four hours; and Scheerer accepted, with slight modifications. The terms laid down were: $200,000 in the company's bonds secured by mortgage on its assets, at eight per cent., not callable for ten years; $50,000 to pay counsel fees of $25,000, the actual disbursements of the litigations and the balance to be divided among the three Bennetts for their services in the

litigations; Scheérer to pay the federal income tax on the sale; the trustee not to have commissions beyond $97,500 and was to make no charge for disbursements in defending the various suits. As modified, the formal contract entered into by the parties provided for the payment of $200,000 in cash with a guaranteed income of eight per cent. per annum for ten years; $45,000 for counsel fee and expenses (out of which Harris paid the Bennetts, each, $5,000); Scheerer to pay the federal income tax and to relieve the estate of charges by the trustee for legal expenses in the litigations and of commissions on the $200,000 trust fund in excess of one and a half per cent. The aggregate of these items exceed $300,000. Now, after enjoying an eight per cent. annual income for nearly nine years, the Bennetts claim that they were deceived in the value of their shares, in the value of the tangible assets and of the good will of the company, and consequently were misled in fixing the price of their stock, and they ask that the settlement be set aside and that their stock be restored to the estate. They offer as an explanation for their tardiness, that they had but recently learned from their lawyer, Siff, now deceased, that the income of the company for the year following the sale, 1922, was $350,000, and, *arguendo* that they were cheated.

The bill, after rehashing the many complaints that led to the previous litigations and which were supposed to have been adjusted in the settlement, sets up that because of meager dividends, contrived by Scheérer to oppress them into submission, complainants were in reduced circumstances and in financial distress; that their lawyer, Harris, urged them to make the settlement, painting a gloomy picture of their future if they did not; that Siff, by duress and coercion, endeavored to have them accept; that their lawyers were fraudulently imposed upon by Scheerer's false representations that their one-half share was worth but $200,000, and that Scheerer, his brother and the milk company, formed a conspiracy to defraud them, in that they suppressed the true value of the stock and prevented the complainants from learning it.

The bill is unrestrained in its charges against Scheerer of conspiracy, imposition and fraud in the sale, that find no warrant in allegations, nor support in the proofs. It is meager in allegations of specific misrepresentation or of suppression of the truth of specified facts. In a summary, the causes for action are stated as fraudulent suppression of material facts and failure to disclose material facts; conspiracy to procure a sale at an inadequate price, and to further the conspiracy, subjecting the complainants to duress, oppression and coercion; false representation of the value of the stock to their attorneys and that the price "was so shockingly inadequate that the contract is unconscionable." We must look to the briefs to get the precise point of the grievances.

We pause to observe that the insinuation in the bill, that Scheerer agreed to pay Harris a fee of $45,000 to favor the sale, upon his alleged false representation that the complainants' stockholdings were worth only $200,000, is not only untrue but was untrue to the knowledge of the complainants, and to reprehend it as a willful slur upon counsel and a slander of the defendant. The $50,000 item for counsel fee and costs was entirely the creation of the complainants. Cut to $45,000, the complainants profited to the extent of $5,000 each, which they exacted, leaving the balance to Harris, out of which to pay the accountant and other charges of the litigation and for his compensation.

There is not a whit of testimony of misrepresentation by Scheerer in coming to a settlement, but the complainants contend, in their brief, that he owed them a duty to make full disclosure of the condition of the company and to advise them of the value of their stock, and that he failed them. That was not due them from Scheerer as a co-stockholder or officer of the company. *Kelly* v. *Black, 90 N. J. Eq. 439.* But they point to the fact that he was, as well, chairman of the board of directors of the Fidelity Union Trust Company, the trustee of the shares he bought, and argue that from this position sprung a relation of trust and confidence that puts upon him the burden of proving full disclosure

and that no advantage was taken. Assuming the argument to be sound, it must be conceded that though there subsists bitter strife between a trustee and his ward, and there be no trust and confidence in fact, in consequence, and that they deal at arm's length, the duty of a trustee nevertheless prevails of acting fairly and of proving it. Animosity does not excuse the one nor dispense with the other. Assuming further that Scheerer, in virtue of his office in the trust company, was in legal theory a trustee (in practice he had no contact with the trust; that was in charge of the head of another department of the company), the proofs are satisfying that his conduct was consistent with the standards of duty of a trustee established in equity jurisprudence.

There is no just complaint of the management. It was capable, highly efficient and profitable. Salaries were modest, so were the dividends, considering the earnings. The earnings were used in expansion or were accumulated. There is no objection that there was not a true account kept of every penny of income and of disbursements and that the items of all tangible property were recorded and that the books of the company were scrupulously kept. The criticism is that the books carried the physical assets of the company at their liquidation values instead of at their current or replacement values, and hence the surplus of the company, as shown by the books on December 31st, 1919, was but $158,560.78. That was the company's method and if it was erroneous, not modern accountancy, the complainants knew it when they made the settlement, for they had the books and their accountant, in revising them and in closing them as of December 31st, 1919, estimated the surplus at $509,754.44. He reached this result by writing up the physical assets from their book value to his appraised value and by including an item of $135,350.55 for good will. The higher estimated values were arrived at by an independent appraisal of the real property, which the complainants' attorneys caused to be made. The books, thus revised by them as of December 31st, 1919, were the ground work of the earlier litigation in the orphans court and in this court and upon the revision,

the complainants staked their hope for success. When the settlement came, two years later, the tangible assets and their value as fixed by them as of December 31st, 1919, plus the profits of 1920 and the probable profits of 1921, formed the basis of their calculation of the value of their holdings. The books for 1920, 1921, disclosed the operation of the business for those years. The complainants say they did not have them, but they had the court's order for their inspection and could have had them for the asking. They knew that they would reveal the net income for the year 1920, and they also knew that the income for 1921 had not been ascertained (the books had not been balanced) and that Scheerer did not know what it would be; but, as the company had been prosperous in the past, it was their privilege to surmise, as it was Scheerer's, that there had been handsome profits, for they knew what the annual net income was in the years previous to 1919, and that in that year it was $115,636.08; and they had the company's income tax report for 1920, which was afterwards (1924) revised by the government to $166,673.40, upon which a tax of $54,258.92 was paid. In fact, the complainants had all the available information concerning the condition of the company that Scheerer had or that he could have had. Both parties also had the other side of the picture: That the company's business was purely service, it bought milk from farmers and distributed it to consumers, and that success depended altogether upon the good will of the customer, earned and retained only by a highly efficient management, and that a loss of the manager or a lapse in the service, even for a few days, might mean disaster; that a depression was on, much like the one we are now experiencing; that the Dairymen's League, an organization of farmers, had entered the field in Newark, in competition, to do away with the middleman, such as the company; that the company's milk depot in Newark, an old tobacco factory, its principal single asset, was no longer fit, and that the city authorities had, in effect, condemned it, and had then recently passed an ordinance requiring separate buildings for grade A and B milk, and that to meet the new demands

the company had to be refinanced, a thing wholly out of the question in the strife and litigation which had then been going on for six years.

Now, for the purpose of this suit, after the suit was brought, the complainants again had the books revised; this time by a new accountant who, according to his estimate of the value of the tangible assets and of his interpretation of the books, reports the surplus of the company to be $374,-403.89 as of December 31st, 1919; $488,824.47 as of December 31st, 1920, and $623,748.80 when the settlement was made in December, 1921, and the complainants emphasize that these valuations are exclusive of the value of the good will. This accountant, by his method of adjusting the books, has also sought to demonstrate that the net income for 1920, after income tax, was $139,825.42, and in 1921, $170,283.30, while defendants' accountant in a review and analysis of the reports of complainants' two accountants shows them to be $97,994.65 and $92,101.74, respectively, and that the company's surplus, December 31st, 1921, was $478,093.19, exclusive of good will. No doubt other adversary accountants could produce even greater conflict and confusion. These postmortem findings are of no value, unless thereby it is shown that the complainants were misinformed; and that is not apparent. The present showing, accepting their accountants' estimates of the tangible assets at their face value, does not demonstrate, as they contend, that the price they received was less than one-half the value of the tangible assets and excluded a consideration for the good will, which is their chief complaint, for it cannot be said, in reason, that the horses, wagons, tin cans and bottles and the real estate of the company had the inflated aggregate value, except as part of the plant of the going concern, in which the good will supplied the leaven. The good will was reckoned in by the complainants; it was the subject of a separate item in rounding out the figure they set. Moreover, the Bennetts took the cream, they took cash; Scheerer, the unliquid assets and the venture. As things then stood, and they were critical, their's seemed the safer bet, and, having affirmed the sale

for so many years, they cannot be permitted to repudiate it at this late date, because doing so will be to their advantage.

The Fidelity Union Trust Company, as co-defendant, is called upon to account for the loss sustained by the sale. The grievance against it is, in effect, that it handed the management of the company over to Scheerer and negligently failed to guard the complainants against his pitfalls and permitted them to become his victims. The trust company was not consulted, had no part in the settlement and when it inquired, intervened, was rebuffed and refused all information and participation. The complainants would have none of its advice, spurned its offices and when they had finished with Scheerer, certified to the trustee that it was prejudicial to the estate to hold the shares (using the terms of the trust upon which the power of sale was conditioned) and virtually demanded that it sign on the dotted line. The trustee, it is true, could have declined, but a refusal would have been at the risk of accounting for the loss of the sale had the concern misadventured—an alternative of consequences, inescapable of the complainants' censure, whatever the course taken. The present whimpering of the complainants that the trustee failed to restrain them in their willfulness, failed to nurse, admonish and discipline them in their unruliness and to resist them, though they might face about and hold it responsible for being thwarted, is as pathetic as it is puerile, and the demand by them upon the trustee, made recently before the bill was filed "to enlighten us as to just how you arrived at the figure that you sold our one-half interest for" was not only insincere but artful.

The bill will be dismissed.